UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

ERIC MORA,

          Plaintiff,

   v.

EATON, et al.,

          Defendants.

No. 2:14-cv-0581 KJM DB P

ORDER AND FINDINGS AND
RECOMMENDATIONS

     Plaintiff is a state prisoner proceeding pro se and in forma pauperis with a civil rights action under 42 U.S.C. § 1983. Plaintiff alleges defendants failed to provide him timely medical treatment in violation of the Eighth Amendment. Before the court is defendants' motion for summary judgment, plaintiff's motion for discovery, and plaintiff's motions for appointment of counsel. For the reasons set forth below, the undersigned denies plaintiff's motions for discovery and the appointment of counsel and recommends the summary judgment motion be granted in part and denied in part.

**BACKGROUND**

### I.    Allegations in the Complaint

     Plaintiff seeks relief based on the delay in medical care after his sudden loss of vision and based on his treatment after surgery. He identifies numerous health care providers and correctional officers at California Correctional Center ("CCC") in Susanville as defendants. His

1

specific allegations against each defendant are discussed in more detail in the discussion below of the merits of defendants' motion. Generally, plaintiff alleges the following:

On February 14, 2013, plaintiff was transported from CCC to Reno, Nevada. (Third Amended Complaint ("TAC") (ECF No. 22).) There, he had cataract surgery in his right eye performed by Dr. Hearne. The discharge instructions after surgery told plaintiff to contact Dr. Hearne if plaintiff experienced a "significant loss of vision," among other things. (Id. ¶¶ 30, 32.)

On August 2, 2013, plaintiff was seen by an optometrist at CCC. At that appointment, he made staff aware that he was experiencing "rare, tiny occasional dark spots in his right eye." He was told that they were common and nothing to worry about. (Id. ¶ 38.)

On September 1, 2013,[1] plaintiff "awoke to a sudden loss of vision in his right eye." He submitted a Health Care Services Request. On September 3, a nurse administered a visual acuity test. When plaintiff sought the test results, he was told they had been lost. (Id. ¶¶ 39, 40.)

On September 5, plaintiff was seen by a physician's assistant. On September 9, he was seen by another nurse and again administered a visual acuity test. He informed the nurse that his vision had "become much worse" since the last test just a few days previous. He asked to see a doctor immediately. (Id. ¶¶ 41, 43.)

On September 16, plaintiff was seen by his primary care physician. He also administered a visual acuity test. Plaintiff could no longer see the test letters. (Id. ¶¶ 44, 45.)

On September 17, plaintiff was transported to Reno and seen by Dr. Hearne. Dr. Hearne diagnosed plaintiff with a detached retina. He told plaintiff that "he would have easily restored Plaintiff's right eye to 20/20 vision with a painless 15-minute laser procedure, but it was now too late and beyond repair due to the Defendants refusal to contact him as soon as the sudden loss of vision had begun." Dr. Hearne determined that plaintiff should be sent immediately to eye specialists at the University of California at Davis ("UC Davis"). (Id. ¶¶ 48, 49.)

That same day, plaintiff was transported to Sacramento where he was examined by Dr. Park, a UC Davis Ophthalmologist. Dr. Park told plaintiff his visual acuity was then at 20/400

---

[1] Plaintiff states this date as September 2 in his complaint, but the attachments to the complaint make clear that the date was September 1.

"due to the damage to his retina caused by waiting so long." She recommended surgery which involved injecting oil into plaintiff's eye. While injecting gas was the preferred procedure, oil was used because CCC is at a high elevation. (Id. ¶¶ 50-52.)

On September 19, plaintiff was transported back to UC Davis for the eye surgery by Dr. Park. The discharge instructions stated that plaintiff should not move suddenly, strain, bend, or lift and should lay face down for two weeks. Dr. Park "emphasized to the Plaintiff and the Transportation Officers (Leslie and Kremer), that during the first few hours after surgery it was especially important for Plaintiff to keep extra still while facing down, because the oil injection in Plaintiff's eye needs to settle and should not be agitated." (Id. ¶¶ 53, 54.)

During the return trip, plaintiff complained to the transporting officers that he was unable to lie down. The transportation officers took a route with a rough road that caused plaintiff to hit his head numerous times. These "inadequate transporting conditions" occurred again for plaintiff's two follow-up appointments with Dr. Park. (Id. ¶¶ 57, 58, 62.)

Dr. Park saw plaintiff again on February 6, 2014 for surgery to remove the oil from his eye. After that surgery, plaintiff experienced eye pain, had a droopy eyelid, and his vision deteriorated. The damage to his right eye is permanent and his visual acuity, as of September 2014, was 20/400. (Id. ¶¶ 68-72.)

Plaintiff alleges defendants were deliberately indifferent to his medical needs in violation of the Eighth Amendment and that they were negligent. He seeks a declaratory judgment and compensatory and punitive damages.

## II.    Procedural Background

Plaintiff initiated this action by filing a complaint on February 28, 2014 and a First Amended Complaint on March 23, 2015. (ECF Nos. 1, 4.) On screening, the court found plaintiff stated a potentially cognizable Eighth Amendment claim against defendants Eaton and Gomer. (ECF No. 6.) Plaintiff then filed second and third amended complaints. (ECF Nos. 13, 22.) On May 23, 2016, the previously assigned magistrate judge found that plaintiff stated the following potentially cognizable claims: (1) Eighth Amendment and state law negligence claims

////

1    against defendants Eaton, Gomer, Nweke,[2] and Sanderson for delaying plaintiff's access to a

2    doctor; (2) Eighth Amendment and state law negligence claims against defendants Leslie and

3    Kremer for transporting plaintiff in an unsafe manner; and (3) state law negligence claims against

4    defendants Wooten and Powell for failing to warn plaintiff that the existence of "floaters" was a

5    sign of retinal detachment.  (ECF No. 23.)

6        On February 16, 2017, defendants answered the complaint.  (ECF No. 44.)  The court

7    issued a Discovery and Scheduling Order on February 24, 2017.  (ECF No. 45.)  It set a deadline

8    of June 9, 2017 for discovery and a deadline of September 1, 2017 for pretrial motions.  On

9    September 1, 2017, defendants filed the present motion for summary judgment.  (ECF No. 47.)

10   On December 13, 2017, plaintiff filed a Statement of Disputed Facts and a Declaration.  (ECF

11   Nos. 54, 55.)  On December 20, 2017, defendants filed a reply.  (ECF No. 56.)

12       On January 24, 2018, plaintiff moved for an extension of time to file a sur-reply and for

13   the right to conduct discovery.  (ECF No. 57.)  The court denied both requests.  (ECF No. 59.)

14   Plaintiff filed another request for discovery on February 12, 2018.  (ECF No. 12.)  He also

15   recently filed two motions for the appointment of counsel.  (ECF Nos. 61, 62.)

## MOTION FOR SUMMARY JUDGMENT

17       Defendants argue that none of the defendants were deliberately indifferent or negligent in

18   their treatment of plaintiff.

19   **I.      General Legal Standards**

20       **A.  Summary Judgment Standards under Rule 56**

21       Summary judgment is appropriate when the moving party "shows that there is no genuine

22   dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R.

23   Civ. P. 56(a).  Under summary judgment practice, the moving party "initially bears the burden of

24   proving the absence of a genuine issue of material fact."  In re Oracle Corp. Sec. Litigation, 627

25   F.3d 376, 387 (9th Cir. 2010) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).  The

26   moving party may accomplish this by "citing to particular parts of materials in the record,

27

28   ───────────────────────
     [2] This defendant was originally identified by plaintiff as "Booker."

including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or by showing that such materials "do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A), (B).

When the non-moving party bears the burden of proof at trial, "the moving party need only prove that there is an absence of evidence to support the nonmoving party's case." Oracle Corp., 627 F.3d at 387 (citing Celotex, 477 U.S. at 325.); see also Fed. R. Civ. P. 56(c)(1)(B). Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. See Celotex, 477 U.S. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment . . . is satisfied." Id. at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact exists. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In attempting to establish the existence of this factual dispute, the opposing party typically may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. See Fed. R. Civ. P. 56(c)(1); Matsushita, 475 U.S. at 586 n.11.

However, a complaint that is submitted in substantial compliance with the form prescribed in 28 U.S.C. § 1746 is a "verified complaint" and may serve as an opposing affidavit under Rule 56 as long as its allegations arise from personal knowledge and contain specific facts admissible into evidence. See Jones v. Blanas, 393 F.3d 918, 923 (9th Cir. 2004); Schroeder v. McDonald, 55 F.3d 454, 460 (9th Cir. 1995) (accepting the verified complaint as an opposing affidavit because the plaintiff "demonstrated his personal knowledge by citing two specific instances

where correctional staff members . . . made statements from which a jury could reasonably infer a retaliatory motive"); McElyea v. Babbitt, 833 F.2d 196, 197–98 (9th Cir. 1987); see also El Bey v. Roop, 530 F.3d 407, 414 (6th Cir. 2008) (Court reversed the district court's grant of summary judgment because it "fail[ed] to account for the fact that El Bey signed his complaint under penalty of perjury pursuant to 28 U.S.C. § 1746. His verified complaint therefore carries the same weight as would an affidavit for the purposes of summary judgment."). The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

To show the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 631. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" Matsushita, 475 U.S. at 587 (citations omitted).

"In evaluating the evidence to determine whether there is a genuine issue of fact," the court draws "all reasonable inferences supported by the evidence in favor of the non-moving party." Walls v. Central Contra Costa Transit Auth., 653 F.3d 963, 966 (9th Cir. 2011). It is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587 (citation omitted)

**B.  Civil Rights Act Pursuant to 42 U.S.C. § 1983**

The Civil Rights Act under which this action was filed provides as follows:

> Every person who, under color of [state law] . . . subjects, or causes
> to be subjected, any citizen of the United States . . . to the deprivation
> of any rights, privileges, or immunities secured by the Constitution .
> . . shall be liable to the party injured in an action at law, suit in equity,
> or other proper proceeding for redress.

42 U.S.C. § 1983.  The statute requires that there be an actual connection or link between the actions of the defendants and the deprivation alleged to have been suffered by the plaintiff.  See Monell v. Dept. of Social Servs., 436 U.S. 658 (1978); Rizzo v. Goode, 423 U.S. 362 (1976).  "A person 'subjects' another to the deprivation of a constitutional right, within the meaning of §1983, if he does an affirmative act, participates in another's affirmative acts or omits to perform an act which he is legally required to do that causes the deprivation of which complaint is made." Johnson v. Duffy, 588 F.2d 740, 743 (9th Cir. 1978).

Supervisory personnel are generally not liable under § 1983 for the actions of their employees under a theory of respondeat superior and, therefore, when a named defendant holds a supervisorial position, the causal link between him and the claimed constitutional violation must be specifically alleged.  See Fayle v. Stapley, 607 F.2d 858, 862 (9th Cir. 1979); Mosher v. Saalfeld, 589 F.2d 438, 441 (9th Cir. 1978).  Vague and conclusory allegations concerning the involvement of official personnel in civil rights violations are not sufficient.  See Ivey v. Board of Regents, 673 F.2d 266, 268 (9th Cir. 1982).

**II.      Statements of Facts**

Defendants filed a Statement of Undisputed Facts ("DSUF") as required by Local Rule 260(a).  (ECF No. 47-9.)  Plaintiff filed a Statement of Disputed Facts in which he addresses most of defendants' list of facts.  (ECF No. 54.)  Plaintiff also filed a declaration in which he further counters some of defendants' factual assertions.  (ECF No. 55.)

In light of plaintiff's pro se status, the court has reviewed plaintiff's filings in an effort to discern whether he denies any material fact asserted in defendants' DSUF or has shown facts that

////

////

are not opposed by defendants.  The court considers the statements plaintiff made in his verified

third amended complaint[3] and in his declaration, of which he has personal knowledge.

The court has also reviewed plaintiff's sworn testimony given at his deposition.  (See ECF

No. 40 (Defs.' Notice of Lodging Depo. Trscrpt.).)

Below, the court lists the undisputed, material facts.  Disputed material facts are addressed

in the discussion of the merits of defendants' motion below.

1. In February 2013, plaintiff had cataract surgery on his right eye performed by

Dr. Hearne of the Eye Surgery Center of Northern Nevada in Reno, Nevada.

The discharge instructions following that surgery instructed plaintiff to contact

Dr. Hearne if he experienced "severe discomfort, heavy discharge from the

eye, or significant loss of vision."  (Ex. 17 to TAC (ECF No. 22 at 63); TAC

(ECF No. 22), ¶ 30.)

2. When plaintiff returned to CCC following the cataract surgery, on February

14, 2013, defendant Wooten reviewed the discharge instructions with plaintiff.

(Aug. 30, 2017 Decl. of R. Wooten ("Wooten Decl.") (ECF No. 47-7), ¶¶ 5-6;

Ex. 18 to TAC (ECF No. 22 at 65-66).)

////

---

[3] A complaint that is submitted in substantial compliance with the form prescribed in 28 U.S.C. § 1746 is a "verified complaint" and may serve as an opposing affidavit under Rule 56 as long as its allegations arise from personal knowledge and contain specific facts admissible into evidence. See Jones v. Blanas, 393 F.3d 918, 923 (9th Cir. 2004); Schroeder v. McDonald, 55 F.3d 454, 460 (9th Cir. 1995) (accepting the verified complaint as an opposing affidavit because the plaintiff "demonstrated his personal knowledge by citing two specific instances where correctional staff members . . . made statements from which a jury could reasonably infer a retaliatory motive"); McElyea v. Babbitt, 833 F.2d196, 197–98 (9th Cir. 1987); see also El Bey v. Roop, 530 F.3d 407, 414 (6th Cir. 2008) (Court reversed the district court's grant of summary judgment because it "fail[ed] to account for the fact that El Bey signed his complaint under penalty of perjury pursuant to 28 U.S.C. § 1746.  His verified complaint therefore carries the same weight as would an affidavit for the purposes of summary judgment.").
In plaintiff's complaint, his signature follows the statement, "I declare under penalty of perjury that the foregoing is true and correct."  (ECF No. 22 at 21.)  It therefore qualifies as a verified complaint under 28 U.S.C. § 1746 and, to the extent it alleges specific facts from plaintiff's personal knowledge, it carries the same weight as an affidavit proffered to oppose summary judgment.  See Keenan v. Hall, 83 F.3d 1083, 1090 n. 1 (9th Cir. 1996), amended, 135 F.3d 1318 (9th Cir. 1998) (mem.).

3. On April 30, 2013, plaintiff was given a visual acuity test by a nurse at the prison. His right eye tested at 20/20 vision. (Ex. 21 to TAC (ECF No. 22 at 74).)

4. On May 20, 2013, plaintiff's right eye tested as "good." (Ex. 22 to TAC (ECF No. 22 at 76).)

5. On August 2, 2013, plaintiff's right eye tested at 20/40. It was noted that he reported "rare dk spots" or "floaters" but "no flashes." The notations also state "rare floaters for 1m [month]" and that plaintiff had no pain. (Ex. 23 to TAC (ECF No. 22 at 78); Aug. 30, 2017 Decl. of Amy Powell ("Powell Decl.") (ECF No. 47-2), ¶ 7.)

6. On September 1, 2013, plaintiff prepared a Health Care Services Request form on which he wrote

> "My right eye – 6 months ago – Dr. Hearne replaced the lens with an artificial torque lens to remove my cat[a]ract. The new lens has – is – going bad – vision in my right eye has become dark and blur[r]y – rectangle objects – 4 feet away – now appear bent, wavy, dark and indistinguishable – darker to my left. Please help. Vision in my right eye has drastically deteriorated within the past few days.

(Ex. 24 to TAC (ECF No. 22 at 81).)

7. Plaintiff handed the Health Care Serves Request form to defendant Nweke. (TAC (ECF No. 22 at 10), ¶ 39.)

8. Defendant Nweke routed plaintiff's Health Care Services Request to the triage nurse, defendant Wooten, at 9:00 a.m. on September 2, 2013. (Aug. 29, 2017 Decl. of Alisha Nweke ("Nweke Decl.") (ECF No. 47-1), ¶ 10.)

9. CCC was on lockdown on September 2, 2013. (Nweke Decl. (ECF No. 47-1), ¶ 8.)

10. The Health Care Services Request form shows that defendant Wooten reviewed the request on September 2, 2013. Wooten scheduled plaintiff to be seen by defendant Eaton, a registered nurse, the following day. (Id.; Aug. 30, 2017 Decl. of Zackary Eaton ("Eaton Decl.") (ECF No. 47-8), ¶ 4.)

9

11. In his declaration, Eaton states that on September 3, he "checked [plaintiff's] symptoms, administered a visual acuity test, and documented his medical history." He found that plaintiff's "right eye performed in the middle range of eyesight, his right eye was not cloudy, and he did not have any pain." He was concerned that plaintiff was at risk of bumping into something due to his poor eyesight. Eaton states that he categorized plaintiff's need for care as "routine," meaning plaintiff would be seen by a doctor within fourteen days. (Eaton Decl. (ECF No. 47-8), ¶ 6.)

12. The Health Care Services Request form shows notations by Eaton. (Eaton Decl. (ECF No. 47-8), ¶ 6.) He described the problem as "R eye going blurrier day by day for last 2 wks." It notes that plaintiff had cataract surgery on his right eye six months previously. It also notes that the right eye tested at 20/100. It states that plaintiff is at "risk for injury [illegible] blurry vision." The form shows that plaintiff was scheduled for an appointment on September 16, 2013 with his primary care provider. (Ex. 24 to TAC (ECF No. 22 at 81).)

13. A form dated September 5, 2013, states "BFS: Ophthalmology. Repeat Visual Acuity or Locate and Scan Visual Acuity done by Zack on 9-3-13." This document appears to be signed by defendant Gomer, a physician's assistant. (Ex. 25 to TAC (ECF No. 22 at 83).)

14. A Primary Care Provider Progress Note signed by defendant Gomer and dated September 5, 2013 states, among other things, that plaintiff had a "sudden decrease of Vision on the surgically corrected Rt eye." Under "Lab/Imaging Results" the form states "Visual Acuity done on 9/4/13 is pending scanning delay." That note also listed plaintiff's "Cataracts surgery on 2/14/13," the "plan" for which was "RFS: Ophthalmology f/u." (Ex. 26 to TAC (ECF No. 22 at 86).)

15. A Physician Request for Services form dated September 5, 2013 and signed by defendant Gomer describes the principle diagnosis as "Sudden ↓ in vision on

Rt eye which was surgically corrected for cataracts 2/14." A referral to Ophthalmology was listed as "Urgent." The other options on the form are "Emergent" and "Routine." "Urgent" appears to be the middle option. The form lists the following medical necessity: "57 y/o male had a cataract surgery on 2/14/13 had perfect vision on Rt eye for a while. Within the last 2 wks his vision has decreased drastically to how it was prior to the cataract surgery." The "Proposed Provider" is listed as "Dr. Hearne." (Ex. 29 to TAC (ECF No. 22 at 92).)

16. Another visual acuity test was performed on September 16, 2013. For plaintiff's right eye the note states "states 'cannot see letters.'" (Ex. 28 to TAC (ECF No. 22 at 90).)

17. A Primary Care Provider Progress Note dated September 16, 2013 and signed by Dr. Starcevich lists the reason for the visit as "blurred vision R eye." Dr. Starcevich noted the cataract surgery "about 6 months ago by Dr. Hearne." Then, "About 3-4 weeks ago started seein[g] spots R eye, then blurred vision, darkness like he was wearing sun glasses. Today on visual acuity unable to see any of the letters." For the "plan," Dr. Starcevich states that he "Will call Dr. Hearne." (Ex. 30 to TAC (ECF No. 22 at 94).)

18. The Physician Request for Services form filled out by defendant Gomer shows that the referral was "approved" on September 17, 2013. The form further shows that plaintiff saw Dr. Hearne that same day. Dr. Hearne diagnosed the retinal detachment and recommended plaintiff see Dr. Park at UC Davis "within 1 wk or sooner." (Ex. 29 to TAC (ECF No. 22 at 92).)

19. A letter from the UC Davis Department of Ophthalmology lists a date of service as September 17, 2013. It describes a finding of "macula-involving retinal detachment" in plaintiff's right eye and that surgery would be performed "within the next week." (Ex. 32 to TAC (ECF No. 22 at 98).)

////

20. An "After Hospital Summary" shows that plaintiff had surgery on September 19, 2013. The "Patient Instructions" state "Please keep eye patch in place until your follow up appointment tomorrow. . . . No heavy lifting or bending." (Ex. 33 to TAC (ECF No. 22 at 101).)

21. The "Instructions After Retina Surgery" include the following: "No straining or heavy lifting . . . or bending below waist." And, "If oil or a gas bubble was placed in the eye during surgery, you will be asked to spend most of your time (both awake and during the night) with your head in a specific position, frequently face down." (Ex. 33 to TAC (ECF No. 22 at 100, 102).)

22. UC Davis scheduled follow-up appointments for plaintiff on September 20, 2013 and September 24, 2013. (Ex. 34 to TAC (ECF No. 22 at 104).)

23. Defendants Kremer and Leslie drove the van which transported plaintiff to and from each of the medical appointments in Reno to see Dr. Hearne and in Sacramento to see Dr. Park at UC Davis. (TAC (ECF No. 22 at 13-16).) They did not have control over which van was provided to transport an inmate to an outside medical appointment. (Aug. 30, 2017 Decl. of David Leslie ("Leslie Decl.") (ECF No. 47-3), ¶ 4; Aug. 30, 2017 Decl. of Jeffrey Kremer ("Kremer Decl.") (ECF No. 47-6), ¶ 6.) Prison policy requires that inmates be shackled when riding in the transport van. (Leslie Decl. (ECF No. 47-3), ¶ 9.) However, according to prison policy, the inmate is not shackled in place and can sit or lie on the bench in the back of the van. (Id.) Officers typically vary the routes they take to and from an inmate's medical appointments due to the threat of "potential ambush and escape." (Leslie Decl. (ECF No. 47-3), ¶ 11; Kremer Decl. (ECF No. 47-6), ¶ 7.)

24. UC Davis records from an appointment plaintiff had with Ophthalmologist Dr. Park on January 7, 2014 show that plaintiff's vision was "blurry," he was "light sensitive," and he was seeing "double." (Ex. 39 to TAC (ECF No. 22 at 118).)

25. On February 6, 2014, Dr. Park removed the oil that had been placed in plaintiff's eye during the retina surgery.  She wrote that surgery was indicated because plaintiff had "oil in the anterior chamber from anterior migration of silicone oil injector for retinal detachment repair.  Removal of silicone oil is indicated to minimize long-term complications of oil, such as glaucoma and corneal damage."  In notes following the procedure, she wrote that there was a "significant amount of oil in the anterior chamber."  She also wrote that there were "no complications" during that procedure.  (Ex. 40 to TAC (ECF No. 22 at 120-121).)

26. A Response to a Health Care Appeal submitted by plaintiff while he was incarcerated at California State Prison-Solano on December 16, 2014 shows that plaintiff's right eye vision was measure at 20/400 in September 2014.  (Ex. 45 to TAC (ECF No. 22 at 140).)

## III.     Analysis

### A. Eighth Amendment Claims

The court previously found plaintiff stated potentially cognizable claims for deliberate indifference under the Eighth Amendment against defendants Eaton, Gomer, Nweke, and Sanderson for delaying plaintiff's access to a doctor; and against defendants Leslie and Kremer for transporting plaintiff in an unsafe manner.

#### 1.   Legal Standards

The Eighth Amendment prohibits the infliction of "cruel and unusual punishments."  U.S. Const. amend. VIII.  The unnecessary and wanton infliction of pain constitutes cruel and unusual punishment prohibited by the Eighth Amendment.  Whitley v. Albers, 475 U.S. 312, 319 (1986); Ingraham v. Wright, 430 U.S. 651, 670 (1977); Estelle v. Gamble, 429 U.S. 97, 105-06 (1976). Neither accident nor negligence constitutes cruel and unusual punishment, as "[i]t is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause."  Whitley, 475 U.S. at 319.

////

What is needed to show unnecessary and wanton infliction of pain "varies according to the nature of the alleged constitutional violation." Hudson v. McMillian, 503 U.S. 1, 5 (1992) (citing Whitley, 475 U.S. at 320). In order to prevail on a claim of cruel and unusual punishment, however, a prisoner must allege and prove that objectively he suffered a sufficiently serious deprivation and that subjectively prison officials acted with deliberate indifference in allowing or causing the deprivation to occur. Wilson, 501 U.S. at 298-99.

For an Eighth Amendment claim arising in the context of medical care, the prisoner must allege and prove "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." Estelle, 429 U.S. at 106. An Eighth Amendment medical claim has two elements: "the seriousness of the prisoner's medical need and the nature of the defendant's response to that need." McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1992), overruled on other grounds by WMX Techs., Inc. v. Miller, 104 F.3d 1133 (9th Cir. 1997) (en banc).

A medical need is serious "if the failure to treat the prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" McGuckin, 974 F.2d at 1059 (quoting Estelle, 429 U.S. at 104). Indications of a serious medical need include "the presence of a medical condition that significantly affects an individual's daily activities." Id. at 1059-60. By establishing the existence of a serious medical need, a prisoner satisfies the objective requirement for proving an Eighth Amendment violation. Farmer v. Brennan, 511 U.S. 825, 834 (1994).

If a prisoner establishes the existence of a serious medical need, he must then show that prison officials responded to the serious medical need with deliberate indifference. See Farmer, 511 U.S. at 834. In general, deliberate indifference may be shown when prison officials deny, delay, or intentionally interfere with medical treatment, or may be shown by the way in which prison officials provide medical care. Hutchinson v. United States, 838 F.2d 390, 393-94 (9th Cir. 1988).

Before it can be said that a prisoner's civil rights have been abridged with regard to medical care, "the indifference to his medical needs must be substantial. Mere 'indifference,' 'negligence,' or 'medical malpractice' will not support this cause of action." Broughton v. Cutter

Laboratories, 622 F.2d 458, 460 (9th Cir. 1980) (citing Estelle, 429 U.S. at 105-06); see also Toguchi v. Soon Hwang Chung, 391 F.3d 1051, 1057 (9th Cir. 2004) ("Mere negligence in diagnosing or treating a medical condition, without more, does not violate a prisoner's Eighth Amendment rights."); McGuckin, 974 F.2d at 1059 (same). Deliberate indifference is "a state of mind more blameworthy than negligence" and "requires 'more than ordinary lack of due care for the prisoner's interests or safety.'" Farmer, 511 U.S. at 835.

Delays in providing medical care may manifest deliberate indifference. Estelle, 429 U.S. at 104-05. To establish a claim of deliberate indifference arising from delay in providing care, a plaintiff must show that the delay was harmful. See Hallett v. Morgan, 296 F.3d 732, 745-46 (9th Cir. 2002); Berry v. Bunnell, 39 F.3d 1056, 1057 (9th Cir. 1994); McGuckin, 974 F.2d at 1059; Wood v. Housewright, 900 F.2d 1332, 1335 (9th Cir. 1990); Hunt v. Dental Dep't, 865 F.2d 198, 200 (9th Cir. 1989); Shapley v. Nevada Bd. of State Prison Comm'rs, 766 F.2d 404, 407 (9th Cir. 1985). In this regard, "[a] prisoner need not show his harm was substantial; however, such would provide additional support for the inmate's claim that the defendant was deliberately indifferent to his needs." Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006).

Finally, mere differences of opinion between a prisoner and prison medical staff or between medical professionals as to the proper course of treatment for a medical condition do not give rise to a § 1983 claim. See Toguchi, 391 F.3d at 1058; Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1996); Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir. 1989); Franklin v. Oregon, 662 F.2d 1337, 1344 (9th Cir. 1981).

### 2. Is Summary Judgment Appropriate on the Eighth Amendment Claims?

There is no question that plaintiff's eye problem was a "serious medical need" under the Eighth Amendment. The questions at issue are whether each defendant was deliberately indifferent to that need.

### a. Defendant Nweke

Plaintiff gave his Health Care Services Request form to defendant Nweke on September 1, 2013. Nweke then gave it to the triage nurse, defendant Wooten, who reviewed it on the morning of September 2. Plaintiff's primary complaint about Nweke seems to be that she did not treat his

eye problem as an emergency.  He states that he told her he had had a sudden loss of vision and had cataract surgery previously.  (Plt.'s Decl. (ECF No. 55) at 54.)  According to plaintiff, Nweke then responded, "during this lockdown, if you're not dying, you can't see a doctor."  (Id. at 55.)

Plaintiff contends Nweke should have known plaintiff's condition was an emergency and should have taken steps to contact a physician.  He further contends that her "delay" in turning in his Health Care Services Request form was "critical."  (Id. at 56.)

However, the undisputed facts show that Nweke was a "licensed vocational nurse" who was authorized to collect data and perform limited nursing tasks.  She was not authorized to interpret data or determine "treatment priorities" or "levels of care."  (Nweke Decl. (ECF No. 47-1), ¶¶ 5, 6.)  The undisputed facts further show that the triage nurse considered plaintiff's request for health care at 9:00 a.m. on the morning following plaintiff's submission of the request.  Plaintiff does not explain just when on September 1 he gave Nweke the form; nor does he show that review of the form by a triage nurse the following day was medically unacceptable.  On these facts, this court finds that no trier of fact would reasonably find that Nweke's conduct was so unacceptable that it amounted to deliberate indifference to plaintiff's eye condition.  Summary judgment should be granted on plaintiff's Eighth Amendment claim against defendant Nweke.

### b.  Defendant Eaton

Defendant Eaton is a registered nurse.  (Eaton Decl. (ECF No. 47-8), ¶ 2.)  Eaton examined plaintiff on the morning of September 3, 2013.  He states the following regarding that examination:

> Mr. Mora's examination was not alarming - his right eye performed in the middle range of eyesight, his right eye was not cloudy, and he did not have any pain.  I noted that he had a risk for injury because of his blurry vision, but by that I did not mean that he had a risk of injury to his eye.  Rather, I meant that he had a risk of injuring himself because he reported that he had been bumping into things because of his poor eyesight.

(Id. ¶ 6.)  Eaton felt that plaintiff needed an appointment with his primary care provider on a "routine" basis.  (Id. ¶ 7.)

The Health Care Services Request form was signed by Wooten, the triage nurse, and, the next day, by Eaton.  (Ex. 24 to TAC (ECF No. 22 at 81).)  Eaton states that all of the notations on

16

the form in Part II, with the exception of the date of plaintiff's follow-up appointment and Wooten's signature, are his.  (Eaton Decl. (ECF No. 47-8), ¶ 3.)

The form shows that plaintiff sought health care services because he had had cataract surgery six months previously and the vision in his eye had become "dark and blur[r]y" and had "drastically deteriorated within the past few days."  (Ex. 24 to TAC (ECF No. 22 at 81).)  Eaton's notations show that plaintiff's vision was getting worse "day by day;" Eaton understood that plaintiff had had cataract surgery six months previously; and plaintiff's right eye tested at 20/100. In addition, plaintiff's vision was so bad that he had been bumping into things and Eaton expressed concern that this was a risk to plaintiff.  (Id.; Eaton Decl. (ECF No. 47-8), ¶ 6.)

The action Eaton took was to schedule plaintiff for a routine doctor's appointment. According to the form, that appointment should have been scheduled to occur within the next fourteen days.  (Ex. 24 to TAC (ECF No. 22 at 81).)  The other options were seeking immediate help for plaintiff by labeling his problem an "emergency" or providing help within 24 hours by scheduling an appointment on an "urgent" basis.  (Id.)

Besides stating that plaintiff's problem was not "alarming," Eaton does nothing to explain why he felt plaintiff, whose vision was worsening daily, did not need to see a physician sooner.

Defendants argue that Eaton did not subjectively know about plaintiff's untreated eye injury.  However, that is not the test.  The question is whether scheduling plaintiff for a follow-up appointment that could have been, and was, two weeks later was medically acceptable under the circumstances.  Defendants present no evidence to establish that requiring plaintiff to wait up to two weeks to see a physician was medically acceptable under the circumstances.

It is true that plaintiff has not proved that Eaton's conduct was medically unacceptable or that it caused plaintiff injury.  However, when plaintiff was finally seen by a physician, he was immediately transported to see his eye surgeon, who, in turn, immediately referred him to a retina specialist.  The court can infer from these doctors' conduct that obtaining appropriate care for plaintiff in a timely manner was extremely important.  The fact that Eaton was unaware that plaintiff was suffering retinal detachment does not mean that a reasonable registered nurse in his position would not have sought immediate help from a doctor for plaintiff's sudden loss of vision

in the eye he had had surgery for just six months prior. The court finds that whether Eaton acted with deliberate indifference is a question that cannot be resolved by the undisputed facts in this case. Summary judgment should be denied on plaintiff's Eighth Amendment claim against Eaton.

### c. Defendant Gomer

Defendant Gomer is a physician's assistant ("PA") who examined plaintiff on September 5, 2013. Gomer states that as a PA he is qualified to administer visual acuity tests but not to diagnose or treat patients. (Gomer Decl. (ECF No. 47-4), ¶ 3.) Gomer noted plaintiff's "sudden decrease in vision" at the appointment. (Id. ¶ 5.) He determined that plaintiff should be seen by the ophthalmologist who performed the cataract surgery. (Id. ¶ 6.) He completed a Health Care Services Physician Request for Services form and marked it "urgent." (Ex. 29 to TAC (ECF No. 22 at 92).) The form shows that the other options for the timing of the referral were "emergent" and "routine." (Id.) "Urgent" appears to have been the mid-range option. The form does not indicate how quickly an "urgent" request will be addressed. Gomer states that he had no control over how quickly the request would be addressed. (Gomer Decl. (ECF No. 47-4), ¶ 7.)

Plaintiff argues that Gomer failed to examine him or give him a visual acuity test. (Plt.'s Decl. (ECF No. 55 at 72-73).) He states that Gomer only shined a light into his eye for about thirty seconds. While Gomer did note that the visual acuity test done by Eaton was lost and either it needed to be located or a new visual acuity test needed to be done, it is not clear that it was medically unacceptable for Gomer not to conduct such a test. Further, Gomer presumably had access to the results of Eaton's testing, which were recorded on plaintiff's Health Care Services Request form.

Plaintiff next argues that Gomer took no action to make a referral to a physician. (Plt.'s Decl. (ECF No. 55 at 70).) However, that is not the case. The undisputed facts show that Gomer did, in fact, recognize that plaintiff should be seen by his ophthalmologist and took steps to get approval for plaintiff to see Dr. Hearne. Plaintiff also argues that Gomer "had the authority to telephone Dr. Hearne from Gomer's desk top phone as soon as [plaintiff] explained to Gomer that his surgically corrected eye had been rapidly going blind." (Id.)

Gomer does not address that assertion. He does not explain whether he had the authority to contact Dr. Hearne. Nor does Gomer explain: (1) why he labelled the necessity of plaintiff's referral "urgent" rather than "emergent;" and (2) what he understood about the amount of time it took the prison to consider an "urgent" referral, as opposed to an "emergent" one. This court finds too many material facts are in dispute to determine whether Gomer acted with deliberate indifference when he chose to refer plaintiff to his ophthalmologist on an "urgent" basis. Summary judgment should be denied on plaintiff's Eighth Amendment claim against defendant Gomer.

### d. Defendant Sanderson

Plaintiff contends defendant Sanderson, a registered nurse, performed a second visual acuity test on September 9, 2013. (TAC (ECF No. 22), ¶ 43.)

The prison has no record of any test performed by Sanderson. (See Aug. 29, 2017 Decl. of Janet Sanderson ("Sanderson Decl.") (ECF No. 47-5), ¶ 3.) Sanderson herself does not recall examining plaintiff on that day. (Id.) However, plaintiff states that she did so, based on a diary he kept of all his interactions with prison staff regarding his medical care. (Plt.'s Decl. (ECF No. 55 at 74-75).)

According to plaintiff, Sanderson told him she was there to perform the test because Eaton lost the visual acuity test he had done on September 3. (Id. at 75.) Plaintiff states that he informed Sanderson that his right eye had become much worse in the few days since Eaton tested it. (Id.; TAC (ECF No. 22), ¶ 43.) Plaintiff states that he also informed her about his cataract surgery and the need to contact Dr. Hearne. Sanderson refused to take him to the prison's medical clinic or to consider plaintiff's eye problem an emergency. Plaintiff also notes that Sanderson, like Eaton, appears to have lost the results of his visual acuity test. (Plt.'s Decl. (ECF No. 55 at 77).)

Nothing in the record shows what Sanderson did, or did not do, in response to her examination of plaintiff and plaintiff's alleged plea for help. Based on plaintiff's medical record, the court can infer that Sanderson took no action to have plaintiff seen more quickly by a physician. Again, the court's is unable to determine whether Sanderson acted with deliberate

indifference.  Therefore, summary judgment should be denied on plaintiff's Eighth Amendment

claim against Sanderson.

### e.  Defendants Leslie and Kremer

Defendants Leslie and Kremer transported plaintiff to see Dr. Hearne in Reno and Dr.

Park in Sacramento on September 16, 2013.  They also transported him back to Sacramento for

surgery the following day and for the two follow-up appointments.  Plaintiff contends Dr. Park

told Leslie and Kremer that "during the first few hours after surgery it was especially important

for Plaintiff to keep extra still while facing down, because the oil injection in Plaintiff's eye needs

to settle and should not be agitated."  (TAC (ECF No. 22), ¶ 54.)  Plaintiff also notes that the

after-surgery instructions stated that plaintiff should not move suddenly, strain, bend or lift, and

should lie face down for most of the next two weeks.  (Id.)  He says Leslie and Kremer had

possession of the written instructions on the trip back to CCC.  (Plt.'s Decl. (ECF No. 55 at 82).)

Plaintiff states that before they transported him back to CCC, Leslie and Kremer "inappropriately

over tightened Plaintiff's chains and man[a]cles."  (TAC (ECF No. 22), ¶ 55.)  Plaintiff states that

he complained to Leslie and Kremer that the transport van was not adequately equipped for him

to lie down and that the tight chains and bumpy ride were causing pressure and strain to his eye.

(Id. ¶¶ 56, 57.)  Leslie and Kremer did nothing in response.  In addition, defendant Leslie then

chose to drive back to Susanville on a rough road that caused plaintiff to jerk and bounce and hit

his head numerous times.  (Id. ¶ 57.)  Plaintiff states that the rough ride made it impossible to

follow Dr. Park's instructions.

Plaintiff contends he experienced the same problems in the van when he was transported

to Sacramento and back the following day and again three days later.  (Id. ¶¶ 58, 62.)

Plaintiff states that his eye did not heal because the oil did not settle properly due to the

inadequate accommodations in the van and the intentionally bumpy ride.  (Plt.'s Decl. (ECF No.

55 at 88).)  As a result, after the oil removal surgery, plaintiff suffered serious complications,

resulting in pain and loss of his vision.

In their declarations, defendants Leslie and Kremer state that they do not recall specifics

of the transport of plaintiff.  Officer Leslie states that he recalls that he and Kremer provided

transportation for plaintiff when underwent a long surgery in Sacramento in September 2013. (ECF No. 47-3 at 2.)  However, he recalls few specifics about the trips and his declaration primarily explains "the procedures we follow when transporting inmates to and from CCC for offsite medical services."  (Id.)  One relevant point Leslie did recall was that during one of plaintiff's trips, they took "Route 89 rather than Route 80 because I thought the road would be less rough and windy."  (Id. at 3.)  Officer Kremer's declaration contains no specifics.  (ECF No. 47-6.)  He states that he has no memory of transporting plaintiff.  (Id. at 2.)  He also provides information about the general procedures officers follow when transporting inmates to medical appointments.

Because defendants provide nothing to the contrary, for purposes of summary judgment, this court should take as true plaintiff's statements that: (1) Leslie and Kremer were specifically instructed by the Dr. Park that plaintiff should be lying down and not agitated during the trip following his surgery, (2) that plaintiff was manacled in such a way that he was unable to lie down safely during the trip, and (3) that the drive was bumpier than necessary, causing plaintiff to be unable to lie still and to hit his head.  Further, there are questions of fact about whether the post-surgery trips caused the oil placed in plaintiff's eye not to settle properly and that shifting in the oil caused plaintiff to suffer injury to his eye after the oil was removed.  On the evidence presented, the court recommends summary judgment be denied on plaintiff's claims against Leslie and Kremer.

**B.  Negligence Claims**

In addition to the defendants mentioned in the prior section, the court found plaintiff stated negligence claims against defendants Wooten and Powell for their failure to inform plaintiff that the appearance of "floaters" in his vision could signal a detached retina.  Plaintiff's tort claims are governed by state law.

**1.  Legal Standards**

A public employee is liable for injury to a prisoner "proximately caused by his negligent or wrongful act or omission."  Cal. Gov't Code § 844.6(d).  "Under California law, '[t]he elements of negligence are: (1) defendant's obligation to conform to a certain standard of conduct

for the protection of others against unreasonable risks (duty); (2) failure to conform to that standard (breach of duty); (3) a reasonably close connection between the defendant's conduct and resulting injuries (proximate cause); and (4) actual loss (damages).'" Corales v. Bennett, 567 F.3d 554, 572 (9th Cir. 2009) (quoting McGarry v. Sax, 158 Cal. App. 4th 983, 994 (2008)).  For negligence claims based on medical malpractice, defendant has a duty "to use such skill, prudence, and diligence as other members of his profession commonly possess and exercise." Hanson v. Grode, 76 Cal. App. 4th 601, 606 (1999).

### 2.  Is Summary Judgment Appropriate on the Negligence Claims?

To the extent the court finds summary judgment inappropriate on plaintiff's claims against defendants Eaton, Gomer, Sanderson, Leslie, and Kremer for deliberate indifference, summary judgment is also, necessarily, inappropriate for plaintiff's claims of negligence against these defendants.  If a trier of fact finds their conduct does not rise to the level of the Eighth Amendment standard, then it should be permitted to consider whether those defendants acted unreasonably in their care of plaintiff.

However, the court recommends above that summary judgment be granted on the Eighth Amendment claims against defendant Nweke.  Therefore, in addition to considering plaintiff's negligence claims against defendants Wooten and Powell, the court considers that claim against Nweke.

### a.  Defendant Powell

Defendant Powell was the nurse who participated in the examination by Optometrist Smith on August 2, 2013 at CCC.  (TAC (ECF No. 22), ¶ 38.)  Plaintiff states that he told "staff" that he was experiencing "rare, tiny occasional dark spots in his right eye."  (Id.)  Powell told him those were called "floaters" and were nothing to worry about.  In his declaration, plaintiff contends he told Powell that he should be referred to his ophthalmologist, Dr. Hearne, because the floaters were new and Dr. Hearne had warned him to contact him immediately if anything went wrong with his right eye.  (Plt.'s Decl. (ECF No. 55 at 51).)  Plaintiff also changes his description of what he told Powell.  In his declaration, plaintiff states that he did not tell Powell the floaters were "rare" or "occasional" but told her they were "streaming by."  (Id. at 52.)

In his complaint, plaintiff alleges Powell should have told him that floaters are a warning sign for retinal detachment after cataract surgery. (TAC (ECF No. 22), ¶ 38.) In his declaration, plaintiff expands that allegation to argue that Powell had no authority to diagnose the floaters as nothing to worry about and should have contacted Dr. Hearne. (Plt.'s Decl. (ECF No. 55 at 52).) Plaintiff does not explain what the optometrist told him during this August 2 visit or why it was Powell, rather than the doctor, who bore the responsibility for any diagnosis and for contacting Dr. Hearne.

In her declaration, defendant Powell states that it was Dr. Smith, not herself, who made notations on plaintiff's medical record that read "rare floaters for 1 m[onth]" and "no flashes." (Powell Decl. (ECF No. 47-2), ¶ 7.) Therefore, it is apparent that Dr. Smith was aware of plaintiff's floaters and could have provided any appropriate diagnosis and taken any appropriate action. Plaintiff does not show why defendant Powell, a nurse practicing under the direction of the doctor, bore responsibility for providing a diagnosis or for contacting Dr. Hearne. The undisputed facts show no negligence or gross negligence on the part of defendant Powell. Summary judgment should be granted in her favor.

### b. Defendant Wooten

Defendant Wooten was also a nurse. He saw plaintiff when plaintiff returned to CCC in February 2013 after his cataract surgery. Wooten discussed plaintiff's post-op instructions with him. Plaintiff contends that defendant Wooten should have informed him then that floaters were a warning sign of retinal detachment after cataract surgery. (TAC (ECF No. 22), ¶ 33.) Plaintiff alleges that when he confronted Wooten later about his failure to warn plaintiff about the floaters, Wooten responded that he should have so informed plaintiff but it "slipped his mind." (Id. ¶ 60.)

In his opposition to the summary judgment motion, plaintiff adds contentions that he told Wooten he "need[ed] to know about any particular early warning signs of any kind of trouble or damage to his eye that was not written on the standard discharge instructions." (ECF No. 55 at 48.) Plaintiff states that Wooten replied, "there are none." According to plaintiff, because Wooten was not qualified to give answers to these questions, he had an obligation to contact Dr. Hearne so that plaintiff's questions could be answered. (Id.)

23

Also in his opposition, plaintiff notes that he discovered for this first time after reviewing Wooten's declaration that Wooten was the triage nurse that reviewed plaintiff's September 1, 2013 request for care. (Id. at 50.) Plaintiff contends Wooten was negligent at that time for not recognizing the signs of retinal detachment and contacting Dr. Hearne.

Plaintiff fails to show Wooten should have known all the possible problems resulting from cataract surgery, had a duty to search out answers to questions plaintiff apparently failed to ask his surgeon Dr. Hearne, or was negligent in conducting a triage evaluation of plaintiff's health care request. The possibility of floaters was not a post-surgery risk described by his doctor in the post-op instructions. (Ex. 17 to TAC (ECF No. 22 at 63).) Plaintiff fails to show a registered nurse at CCC should have had knowledge about the risks of cataract surgery. Plaintiff's reliance on his contention that Wooten told him later he should have warned plaintiff about floaters is hearsay and, in any event, does not establish a standard of care.

Further, plaintiff fails to show Wooten was negligent when he triaged plaintiff's health care request. Wooten scheduled plaintiff to be seen by defendant Eaton the following day for an evaluation. Plaintiff fails to show it was unreasonable for Wooten to allow Eaton, who would examine plaintiff, to make a determination about plaintiff's care. Summary judgment should be granted in Wooten's favor.

### c. Defendant Nweke

As described above, defendant Nweke's actions were the initial response to plaintiff's submission of a Health Care Services Request. It is not clear just what time of day on September 1, 2013 plaintiff handed his request to Nweke. However, the record shows that at 9:00 the next morning, the triage nurse reviewed plaintiff's request. As with defendant Wooten, the court finds an approximately 24-hour, or less, gap between the time Nweke learned of plaintiff's symptoms and the review by another caregiver is not unreasonable. Nweke's job was only to transmit plaintiff's request to the triage nurse, who would make a decision about how quickly plaintiff required care. On these facts, the court finds Nweke did not act unreasonably and summary judgment should be granted in her favor on the negligence claim as well.

////

## MOTION FOR DISCOVERY

On February 12, 2018, two months after he filed his opposition to defendants' summary judgment motion and over eighth months after the June 9, 2017 discovery deadline, plaintiff moves to be permitted to propound discovery.  (ECF No. 60.)  Plaintiff argues that his delay is due to his detainment at the Santa Rita County Jail for fourteen months in 2016 and 2017. Plaintiff states that he was returned to California State Prison-Solano on July 18, 2017.  (Id. at 2.) Plaintiff provides no explanation for his failure to seek an extension of the discovery cut-off while he was in jail or as soon as he was returned to state custody.

 Plaintiff has not established any basis for this court to grant his extraordinary and extremely belated request.  It will be denied.

## MOTIONS FOR THE APPOINTMENT OF COUNSEL

In March, plaintiff filed two motions for the appointment of counsel.  (ECF Nos. 61, 62.) In his first filing, plaintiff simply states that he is indigent and could use the help of an attorney. (ECF No. 61.)  In his second motion, plaintiff reiterates his arguments about why he should be permitted to conduct discovery; states he needs a lawyer's help to do so; states that his case is complex and meritorious; and contends he has mental health issues that make litigating this case difficult.

The United States Supreme Court has ruled that district courts lack authority to require counsel to represent indigent prisoners in § 1983 cases.  Mallard v. United States Dist. Court, 490 U.S. 296, 298 (1989).  In certain exceptional circumstances, the district court may request the voluntary assistance of counsel pursuant to 28 U.S.C. § 1915(e)(1).  Terrell v. Brewer, 935 F.2d 1015, 1017 (9th Cir. 1991); Wood v. Housewright, 900 F.2d 1332, 1335-36 (9th Cir. 1990).

The test for exceptional circumstances requires the court to evaluate the plaintiff's likelihood of success on the merits and the ability of the plaintiff to articulate his claims pro se in light of the complexity of the legal issues involved.  See Wilborn v. Escalderon, 789 F.2d 1328, 1331 (9th Cir. 1986); Weygandt v. Look, 718 F.2d 952, 954 (9th Cir. 1983). Circumstances common to most prisoners, such as lack of legal education and limited law library access, do not

////

establish exceptional circumstances that would warrant a request for voluntary assistance of counsel. In the present case, the court does not find the required exceptional circumstances.

Accordingly, IT IS HEREBY ORDERED that:

1.  Plaintiff's request for the right to conduct discovery (ECF No. 60) is denied.

2. Plaintiff's motions for the appointment of counsel (ECF Nos. 61, 62) are denied.

Further, IT IS RECOMMENDED that defendants' motion for summary judgment (ECF No. 47) be granted in part and denied in part as follows:

1. Defendants' motion be denied with respect to plaintiff's Eighth Amendment and negligence claims against defendants Eaton, Gomer, Sanderson, Leslie and Kremer; and

2. Defendants' motion be granted with respect to plaintiff's claims against defendants Nweke, Powell, and Wooten.

These findings and recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any response to the objections shall be filed and served within seven days after service of the objections. The parties are advised that failure to file objections within the specified time may result in waiver of the right to appeal the district court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

Dated: June 26, 2018

_____
DEBORAH BARNES
UNITED STATES MAGISTRATE JUDGE

DLB:9
DLB1/prisoner-civil rights/mora0581.msj